**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| PACIFIC SHORES PROPERTIES, LLC, a California limited liability company; ALICE CONNER; SEAN WISEMAN; TERRI BRIDGEMAN, *Plaintiffs-Appellants*,<br><br>ANDREW BLAIR, *Plaintiff*,<br><br>v.<br><br>CITY OF NEWPORT BEACH, a California municipal corporation, *Defendant-Appellee*. | No. 11-55460<br><br>D.C. No. 8:08-cv-00457-JVS-RNB |

```
                    RECEIVED
         CLERK, U.S. DISTRICT COURT

                  3/4/2014

    CENTRAL DISTRICT OF CALIFORNIA
                     DLM
    BY: _____ DEPUTY
```

| | |
|---|---|
| NEWPORT COAST RECOVERY LLC, a California Limited Liability Company; YELLOWSTONE WOMEN'S FIRST STEP HOUSE, INC., *Plaintiffs-Appellants*,<br><br>v.<br><br>CITY OF NEWPORT BEACH, a California municipal corporation, *Defendant-Appellee*. | No. 11-55461<br><br>D.C. No. 8:09-cv-00701-JVS-RNB<br><br><br>ORDER |

2    PAC. SHORES PROPERTIES V. CITY OF NEWPORT BEACH

Filed March 4, 2014

Before: Alex Kozinski, Chief Judge, and Stephen Reinhardt
and Sidney R. Thomas, Circuit Judges.

Order;
Dissent by Judge O'Scannlain

## SUMMARY[*]

### Housing Discrimination

The panel filed an order rejecting a sua sponte en banc call.

Judge O'Scannlain, joined by Judges Tallman, Callahan, Bea, and Ikuta, dissented from the denial of rehearing en banc. He wrote that the panel's opinion invented "an entirely unprecedented theory of actionable government discrimination: sinister intent in the enactment of facially neutral legislation can generate civil liability without evidence of discriminatory effect."

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## ORDER

A *sua sponte* call for a vote on rehearing this case en banc was made by an active judge of this court. The call failed to receive a majority of the votes of the nonrecused active judges. Fed. R.App. P. 35.  The *sua sponte* en banc call is rejected.

Judge O'Scannlain's dissent from denial of rehearing en banc is filed concurrently with this Order.

---

O'SCANNLAIN, Circuit Judge, joined by TALLMAN, CALLAHAN, BEA, and IKUTA, Circuit Judges, dissenting from the denial of rehearing en banc:

The panel's opinion in these consolidated cases invents an entirely unprecedented theory of actionable government discrimination: sinister intent in the enactment of facially neutral legislation can generate civil liability without evidence of discriminatory effect.

Such unwarranted expansion of "disparate treatment" doctrine, moreover, recognizes no principled limit.  A single member of any protected class will now be able to challenge a facially neutral—and evenly applied—municipal ordinance without having suffered any actual discrimination.

Our Court, alone among the nation's appellate tribunals, has embarked on an uncharted and highly dubious course.  I respectfully dissent from our refusal to rehear these cases en banc.

4    PAC. SHORES PROPERTIES V. CITY OF NEWPORT BEACH

I

In these cases, residents and operators of "group homes," i.e., communal living arrangements among recovering alcoholics and drug addicts, challenge a municipal ordinance for discriminating against them on the basis of disability.

On January 22, 2008, the city of Newport Beach, California, enacted Ordinance No. 2008-05 to address perceived concerns caused by transients living in residential neighborhoods. The Ordinance redefined certain residential categories that are permitted to occupy various zones of the city. Such categories, as relevant here, included the "single housekeeping unit,"[1] the "group residential" unit[2], and

---

[1] The Ordinance defines the "single housekeeping unit" as "functional[ly] equivalent [to] a traditional family":

> [The] members [of the single housekeeping unit] are an interactive group of persons jointly occupying a single dwelling unit, including the joint use of and responsibility for common areas, and sharing household activities and responsibilities such as meals, chores, household maintenance, and expenses, and where, if the unit is rented, all adult residents have chosen to jointly occupy the entire premises of the dwelling unit, under a single written lease with joint use and responsibility for the premises, and the makeup of the household occupying the unit is determined by the residents of the unit rather than the landlord or property manager.

Newport Beach, Cal., Ordinance No. 2008-05, § 1.

[2] The "group residential" category encompasses other joint living arrangements that do not qualify as single housekeeping units, such as "boarding or rooming houses, dormitories, fraternities, sororities, and

"residential care facilities."[3]  Although single housekeeping units are allowed in any residential district, group residential units are prohibited; residential care facilities, on the other hand, whether pre-existing the Ordinance or opened thereafter, may occupy any residential zone after obtaining a use permit or seeking a reasonable accommodation.  *See* Newport Beach, Cal., Ordinance No. 2008-05, § 2. Premises occupied by recovering addicts may fail to qualify as a "single housekeeping unit" or a "residential care facility," on a case-by-case basis, but the definitions do not exclude disabled individuals as a matter of course.

Plaintiffs—occupants and owners of group homes that qualify as residential care facilities—charged that the Ordinance discriminates against them on the basis of disability in violation of the Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq., the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., the California Fair Employment and Housing Act, Cal. Gov't Code § 12900 et seq., and the Fourteenth Amendment.  Before the district court, they advanced both disparate treatment and disparate impact as theories of liability.  The city successfully sought summary judgment on the disparate treatment claims.  In its disposition, the district court concluded that the plaintiffs "failed to identify any evidence showing that [disabled individuals] were treated differently than similarly situated non-disabled individuals" under the "facially neutral"

---

private residential clubs."  Newport Beach, Cal., Ordinance No. 2008-05, § 2.

[3] Specially exempted from the group residential classification are "residential care facilities," defined as sites where seven or more disabled individuals reside.  *See* Newport Beach, Cal., Ordinance No. 2008-05, § 2.

Ordinance.  The district court's order did not disturb the complainants' disparate impact claims; nevertheless, plaintiffs voluntarily dismissed those claims so that they could pursue this appeal.

The panel reversed the district court, asserting that evidence of discriminatory legislative intent in adopting the Ordinance—without even an allegation of discriminatory effect—is sufficient to permit a claim of disparate treatment to survive summary judgment.  Noting that the plaintiffs had to expend time and resources to comply with the Ordinance, the panel determined that they had suffered an injury under the anti-discrimination laws.[4]

II

According to the panel, the district court, by dismissing as "irrelevant" the "large amount of evidence" about the Ordinance's "allegedly discriminatory intent," ignored the proper analytical framework.  Slip op. at 31.  I respectfully suggest, on the contrary, that it is the panel—not the district court—that ignores  well-settled principles.  Neither our decisions, nor the Supreme Court's, have ever allowed challenges to facially neutral laws by simply alleging discriminatory legislative intent.

---

[4] The panel only discusses in detail the plaintiffs' claims under the FHA and the ADA; this dissent accordingly limits itself to those claims as well.

A

1

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., governs the analytical framework under the FHA and the ADA.  *See Budnick v. Town of Carefree*, 518 F.3d 1109, 1113–14 (9th Cir. 2008); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004). Plaintiffs raising claims of discrimination under these statutes can proceed under either of two distinct theories, styled "disparate treatment" and "disparate impact."   To allege discrimination under a theory of disparate treatment, the plaintiff generally must demonstrate that the defendant treated him differently from similarly situated persons because of his membership in a protected group.   The paradigmatic instance of disparate treatment, accordingly, is the selective enforcement of an otherwise fairly framed law or policy.  *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).   Our precedents have also recognized an "alternative approach" to proving disparate treatment in certain scenarios.  *See McGinest v. GTE Service Corp.*, 360 F.3d 1103 (9th Cir. 2004).  When a worker faces an adverse employment action, or a municipal board denies a permit or zoning variance to an applicant, the aggrieved party may provide direct or circumstantial evidence that impermissible discriminatory intent tainted the decision-making process. *See, e.g.*, *Budnick*, 518 F.3d at 1114 ("When disparate treatment is claimed as a result of the denial of a special use permit . . . . a plaintiff may also simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the challenged decision." (internal quotation marks omitted)).  In such situation, the plaintiffs would not need to show selective

8     PAC. SHORES PROPERTIES V. CITY OF NEWPORT BEACH

enforcement of an employment policy or land-use law to survive summary judgment: this adverse result, motivated by a discriminatory reason, is a sufficient showing of discrimination.

Without exception, the case law of this Circuit has only permitted plaintiffs to invoke such "alternative approach" to challenge the adverse result of an individualized decision-making process allegedly subverted by a discriminatory motive. For example, an employee unjustly terminated or improperly demoted may plausibly allege disparate treatment, even if no one else similarly situated achieved a different outcome, if a discriminatory intent lay behind the decision. *McGinest*, 360 F.3d at 1122; *see also Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002) (en banc); *Lowe v. City of Monrovia*, 775 F.2d 998, 1006–07 (9th Cir. 1985). The situation in FHA and ADA claims is analogous: a developer may assert disparate treatment after a zoning board denies him a permit, or a renter after a landlord suspiciously rejects his application. *See Budnick*, 518 F.3d at 1114. The "alternative approach" to disparate treatment, just like the *McDonnell Douglas* framework, protects against discriminatory application even of an otherwise facially neutral law or policy.

But here, the panel authorizes—as a claim of disparate treatment sufficient to survive summary judgment—a challenge simply to a *facially neutral law itself* and not to any particular suspicious or selective instance of enforcement. This is unprecedented. Discrimination law indeed provides a doctrinal basis for dealing with allegations that an apparently neutral statute nevertheless illegally discriminates against a protected class—but such allegations sound in disparate impact, not disparate treatment. *See, e.g.*, *Budnick*,

518 F.3d at 1118–19 (summarizing the elements of a
disparate impact claim).    The conceptual innovation
introduced by the panel here threatens to collapse the
doctrinal distinction between disparate treatment and
disparate impact as heretofore distinct bases for liability
under the anti-discrimination statutes.

2

The panel plainly overreads our precedents to conclude
that all a plaintiff must allege to survive summary judgment
is that a discriminatory legislative intent lay behind the
challenged law.  Slip op. at 29.  In support, the panel cites
four of our decisions—none of which is on point.    All
concern either an individual adverse employment decision,
*see McGinest*, 360 F.3d 1103; *Costa*, 299 F.3d 838; *Lowe*,
775 F.2d 998, or a rejected application for a permit, *see
Budnick*, 518 F.3d 1109.

The panel goes so far as to assert that once plaintiffs have
given evidence of illicit municipal legislative motive, the
inquiry turns to the "'sensitive' multi-factor inquiry"
catalogued in *Village of Arlington Heights v. Metropolitan
Housing Development Corp.*, 429 U.S. 252 (1977). Slip op.
at 29.  But this puts the cart before the horse.  In *Arlington
Heights* and all the other cited cases, the precise issue was
whether defendants acted with the proscribed discriminatory
intent.  In each case, the plaintiffs had suffered allegedly
discriminatory treatment—for example, the denial of a permit
or the selective enforcement of zoning laws—but did not
attack, as plaintiffs here do, the very enactment of a facially
neutral ordinance.  *See* 429 U.S. at 264–65; *Gallagher v.
Magner*, 619 F.3d 823, 831–33 (8th Cir. 2010) (uneven
enforcement of housing code); *Hallmark Developers, Inc. v.*

10   PAC. SHORES PROPERTIES V. CITY OF NEWPORT BEACH

*Fulton Cnty.*, 466 F.3d 1276, 1283–86 (11th Cir. 2006) (denial of zoning application); *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 579–80 (2d Cir. 2003) (denial of re-zoning request).  Plaintiffs here press a disparate treatment claim, having suffered no such adverse action.

The panel arraigns the district court for the "suggestion that a plaintiff can establish a prima facie case of intentional discrimination only by using the *McDonnell Douglas* burden shifting construct," which, it claims, is the only "way of interpreting the district court's position."  Slip op. at 31.  But this "interpret[ation]" ignores the district court's actual reasoning.  Citing *McGinest*, the district court accurately explained that the "alternative approach" has never permitted "a disparate treatment claim [to] proceed . . . where there has been no showing of actual disparate treatment."  The district judge articulated the precise reason for rejecting the "alternative approach" in this case:

> Plaintiffs have not identified, and the Court has not found, any case in which a facially neutral statute that was passed with an intent to discriminate against a protected class was found to be invalid without an accompanying showing of either actual disparate treatment of others similarly situated or disparate impact on a protected class.

Indeed, the panel does not even attempt to refute this conclusion; rather, the panel ignores it, mischaracterizes the district court's reasoning, and moves on.

Our cases and the decisions of the Supreme Court already permit claims of discrimination even against facially neutral

statutes without any evidence of selective enforcement. But these suits must satisfy the elements of a disparate impact claim. The panel unjustifiably disturbs these settled principles of discrimination law.

B

The panel's characterization of the plaintiffs' injury underscores that its novel theory does not require any actual discrimination at all. The city had defended against plaintiffs' disparate treatment claims for failing to "show that they suffered any adverse effects as a result of its actions, even if those actions were motivated by discriminatory intent, because, on appeal, the Group Homes have not challenged the City's denial of their individual permit applications." Slip op. at 42. But, the panel proclaims, the very "imposition of the Ordinance itself . . . triggered their injuries," principally the time and expenses incurred in complying with the new regulation. *Id.* Our cases have never held that mere compliance with municipal administrative procedures is a sufficient injury to claim disparate treatment. This is particularly pertinent where, as here, a plaintiff has submitted to such procedures and successfully applied for a permit or zoning variance.

For this unprecedented conclusion that a permitting scheme imposed by a facially neutral ordinance could inflict a discrimination injury, the panel invokes *Flores v. Pierce*, 617 F.2d 1386 (9th Cir. 1980). In that case, the plaintiffs had applied for a liquor license but city officials had lodged a complaint with the relevant state regulatory board, resulting in a denial of their application. The "rigors of the governmental or administrative process" were not imposed on the Floreses by a facially neutral law applied evenhandedly

but rather by the city officials' "selective protests."   *Id.* at 1390–91.  Such "selective protests," culminating in an actual harm such as "the denial of [an] application," are precisely the sort of injury against which disparate treatment liability protects: selective enforcement.  *Id.* at 1392.  *Flores* lends no support to plaintiffs who challenge neutral laws without discriminatory treatment.

And it is no wonder that our precedents have never approved a claim of disparate treatment against a facially neutral law in the absence of selective enforcement. "Disparate treatment" suggests, by its conventional meaning as well as dictionary definition, to single out unfavorably and unjustifiably some individual on the basis of a protected trait. The district judge invoked *Schwarz v. City of Treasure Island*, for this obvious but apparently overlooked truth:  "As its name suggests, a disparate treatment claim requires a plaintiff to show that he has actually been treated differently than similarly situated non-handicapped people."[5]  544 F.3d 1201, 1216 (11th Cir. 2008).

Indeed other sister Circuits also have rejected challenges to facially neutral laws based on discriminatory motives of municipal actors.  *See Oxford House-C v. City of St. Louis*,

---

[5] Although *Schwarz* suggests that the "analysis might have been different if . . . the City enacted the [challenged] rule in order to discriminate against people with disabilities," that *obiter dicta* does not validate disparate treatment claims without a discriminatory act.  A contrary conclusion, which the panel finds consistent with *Schwarz*, baldly countermands—as the district court in these present cases indicated—its holding.  The fact that a single district judge violated *Schwarz* by permitting, in the unreviewed decision *Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353 (S.D. Fla. 2012), a disparate treatment claim in the absence of discriminatory act is of no moment.

PAC. SHORES PROPERTIES V. CITY OF NEWPORT BEACH    13

77 F.3d 249, 252 (8th Cir. 1996) (holding that evidence of administrators' biased statements when enforcing a facially non-discriminatory law did not suffice for disparate treatment); *see also Cinnamon Hills Youth Crisis Ctr., Inc. v. St. George City*, 685 F.3d 917, 921 (10th Cir. 2012) (concluding that "general statements suggesting bias" are not enough to allege disparate treatment even in the context of an application for a zoning variance). The panel vainly attempts to distinguish *Schwarz* and *Oxford House-C* by noting that both involved "pre-existing, facially neutral zoning laws" enacted without a "discriminatory purpose." Slip op. at 36. That feature, although present in those cases and absent in the current appeal, is irrelevant. The actual principle of those cases applies perfectly to the situation at hand: without any differential treatment there can be no discrimination— certainly none that the law recognizes, forbids, and punishes.

But the panel's invention signals an abrupt departure from what these cases categorize as an injury caused by discrimination. Plaintiffs need not plead and prove that only *they* outlaid funds and manpower, or that the municipal government prosecuted *them* especially. According to the panel, a plaintiff would present a triable case with only a bare accusation that a councilman or a community activist uttered an epithet in the legislative prelude to a challenged ordinance. As long as the enactment importunes a party in some even menial way, he will have suffered a sufficient injury to allege discrimination—and to survive summary judgment to boot.

III

What appears to bottom the panel's analysis is a policy judgment that rejecting the plaintiffs' disparate treatment claims "would lead to unacceptable results." Slip op. at 31.

Depicting in lurid hues the "grotesque scenario," where conspiratorial city councils enact a "facially neutral law and policy" and enforce the measure "even against similarly-situated individuals who are not members of the disfavored group," the panel asserts that such "overdiscrimination" is simply "not the law." *Id.* at 31–32. These constitutional concerns are overwrought. In the vast majority of cases where a city evenhandedly enforces a neutral ordinance, there is no discrimination. In the exceptional cases when a local legislative body seeks to punish a protected class and, anticipating discrimination suits, extends ill consequences beyond the targeted demographic, suffering plaintiffs have protection. That's where disparate impact comes in: laws that affect both protected and unprotected classes but yet disproportionately injure only the former. That these plaintiffs have abandoned their disparate impact claims does not insulate this or any other city's facially neutral ordinances from future meritorious claims of discrimination.

IV

Finally, the panel's opinion is an ominous portent for future judicial interference with the political branches. Plaintiffs, who include not only disabled individuals themselves but also owners of businesses that operate group homes, quite understandably opposed the piece of inconvenient municipal legislation at issue here. But on appeal, they argue neither that the ordinance facially discriminates against them nor that Newport Beach selectively enforced it against them. Rather they merely claim that the municipal government, along with any number of residents, activists, and community groups, had nefarious intent in enacting the ordinance in the first place. Because this local regulation puts up some red tape—few, if any,

regulations are costless—the panel astoundingly concludes that the plaintiffs made a sufficient showing of a discrimination injury to survive summary judgment.

Yet the panel does not suggest any limiting principle for its searching inquiry into municipal legislative motives. What sorts of pre- or post-enactment statements may a court examine for this impermissible intent—utterances during committee meetings, quotations from newspaper articles, political stump speeches?  Who among the various government actors must express this intent—only those officers with a vote on the city council, or any municipal employee involved in the drafting?  What may or may not private citizens say in support of local initiatives, and when may they say it, lest any of their ill motives taint the legislative process?  Such questions hardly seem appropriate for principled and consistent judicial inquiry.  But the panel, satisfied that an apparent injustice is now remedied, offers no more guidance than its policy preference.  This cannot be the state of coherent and workable anti-discrimination law today.

V

The panel's decision in these cases canonizes a novel theory of liability under the anti-discrimination statutes: plaintiffs may now challenge facially neutral and fairly enforced municipal ordinances on the mere accusation that improper intent had tainted the legislative process without any showing of actual discriminatory treatment.  To quote the panel, this absurd result "is not the law."

I respectfully dissent from the court's regrettable failure to grant en banc rehearing.